**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

ROGER DEAN WAGNER,

        Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.

No. C09-3074-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION**

_____

**TABLE OF CONTENTS**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.  Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.  LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

III.  LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    A.  Commissioner's Objections . . . . . . . . . . . . . . . . . . . . . . . . . 26
        1.  Listing § 1.04A, Disorders of the Spine . . . . . . . . . . . . . 26
        2.  Gastrointestinal Problems . . . . . . . . . . . . . . . . . . . . . . 28
    B.  Report and Recommendation . . . . . . . . . . . . . . . . . . . . . . . 30

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# I. INTRODUCTION

## A. Procedural Background

This case is before the court pursuant to a Report and Recommendation (Docket no. 17) from Chief United States Magistrate Judge Paul Zoss regarding a claim for Social Security disability insurance ("DI") benefits under Title II[1] of the Social Security Act, 42 U.S.C. § 401 *et seq*. I hereby adopt Judge Zoss's findings to introduce the procedural history:

> On August 17, 2007, Wagner filed an application for DI benefits alleging he has been disabled since May 27, 2006. R. 108. His application was denied initially and on reconsideration. A hearing was held before an Administrative Law Judge ("ALJ") on March 17, 2009. R. 23-66. On May 18, 2009, the ALJ issued her decision, ruling that Wagner was not disabled and therefore was not entitled to benefits. R. 6-22. On September 14, 2009, the Appeals Council denied Wagner's request for review (R. 1-3), making the ALJ's decision the final decision of the Commissioner.
>
> Wagner filed a timely Complaint in this court seeking judicial review of the ALJ's ruling. He claims the ALJ's finding that he is not disabled is not supported by substantial evidence in the record. He asks the court to reverse the ALJ's decision and order the award of benefits.
>
> In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to [Chief] United States Magistrate Judge [Paul Zoss] pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Wagner filed a brief supporting his claim on April 23, 2010. (Doc. No. 13) The Commissioner filed a responsive brief on June 21, 2010. (Doc. No. 15)

---

[1] Title II of the Social Security Act provides insurance benefits to individuals who establish that they suffer from a physical or mental disability. *See* 42 U.S.C. § 423.

(Docket no. 17, pp. 1-2).

In Judge Zoss's Report and Recommendation (Docket no. 17), he concluded that Wagner suffers from a disorder of the spine resulting in compromising of a nerve root or the spinal cord under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A ("Listing § 1.04A"), as demonstrated by the MRI of July 10, 2006, showing "a shallow disk hernia at L5-S1, predominantly extending into the left lateral spinous recess impinging on a nerve rootlet in this recess." However, Judge Zoss also found that the record was unclear whether Wagner met the other requirements of Listing § 1.04A, namely, (A) neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, positive straight-leg raising test (sitting and supine); (B) spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; and (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. As a result, Judge Zoss held that the case should be remanded to the Social Security Administration to further develop the record and fully address this issue in its ruling.

Nevertheless, Judge Zoss agreed with three of the ALJ's additional conclusions concerning Wagner's alleged disability. First, Judge Zoss found support in the record for the ALJ's finding that Wagner's daily activities were inconsistent with his claimed disability, because his daily activities went beyond light housework and minimal routine daily activities. Second, Judge Zoss found support in the record that Wagner had been inconsistent in taking his prescribed medication and declined to accept strong pain relievers to combat his back pain. Third, Judge Zoss agreed with the ALJ that Wagner's claims of

disabling pain were contradictory with the findings of his treating physicians. Therefore, Judge Zoss held that the record supported the ALJ's conclusions that the pain associated with Wagner's back injury did not prevent him from work. Still, Judge Zoss noted that the record was unclear as to whether Wagner's gastrointestinal problems affected his ability to work, and to what extent. As a result, Judge Zoss ordered remand to fully develop and address this issue, and for any hypothetical questions presented to the VE on remand to account for possible impairments arising out of Wagner's gastric complications. (Docket no. 17)

On February 9, 2011, the Commissioner of Social Security objected to Judge Zoss's Report and Recommendation (Docket no. 18). The Commissioner argues that Judge Zoss erred in finding that the record did not support the ALJ's conclusion that Wagner did not meet the requirements of Listing § 1.04A. This error, the Commissioner asserts, is due to Judge Zoss's incorrect description of the threshold criterion for Listing § 1.04A, which requires that the plaintiff show nerve root "compression" versus merely the "compromise of a nerve root or the spinal cord." *Id.* at 2. The Commissioner argues that the medical evidence supports the conclusion that there was no nerve root compression, only "insignificant nerve root impingement." *Id.* Additionally, the Commissioner argues that Wagner's existing medical evidence addresses the other criteria of Listing § 1.04A, and demonstrates Wagner's lack of chronic nonradicular pain; limitation of motion of the spine; muscle atrophy and weakness; and positive straight-leg raising ("SLR") tests, sitting and supine. *Id.* Thus, the Commissioner objects to Judge Zoss holding that the record contains insufficient evidence to support a determination regarding such criteria under § 1.04A. *Id.*

The Commissioner also objects to Judge Zoss's finding that the record was "devoid of evidence" regarding Wagner's gastrointestinal problems. The Commissioner notes that

"the ALJ partially credited [Wagner's] allegations regarding his irritable bowel syndrome." *Id.* at 4. Thus, in Wagner's residual functional capacity ("RFC") determination, the ALJ incorporated breaks to accommodate such complications. *Id.* The Commissioner argues that "the medical evidence does not support the existence of functional limitations more severe than those assessed by the ALJ" concerning Wagner's alleged gastrointestinal problems, and as a result, the substantial evidence as a whole supports the ALJ's decision. *Id.* at 4-5.

### B. Factual Background

The following findings of fact have been adopted by the court as found by Judge Zoss in his Report and Recommendation (Docket no. 17):

### 1. Introductory facts and Wagner's hearing testimony

Wagner was born in 1955, and was 53 years old at the time of the hearing. R. 30. He was 5'11" and weighed 180 pounds. He graduated from high school in 1973, with C's and B's. R. 31. He has not had any additional education.

Wagner worked for the same employer for thirty years, as a monument setter. R. 146. On May 26, 2006, the Friday before Memorial Day, he was moving a large piece of granite when it "took [him] down," injuring his lower left back. R. 32. He finished work that day, and returned to work the following week. He worked around the shop throughout that week, but on Monday, June 5, 2006, his back was worse, so on Tuesday, he went to a doctor at a family practice clinic. The doctor restricted his lifting to ten pounds and ordered no stooping, bending, or twisting, and alternate sitting and standing. R. 33.

Wagner participated in physical therapy for about two months, and then returned to work from about July to November, but "didn't do as much." R. 35. The pain in his lower back got worse, extending into his left leg and foot. R. 33-34. He consulted with another doctor, who gave him a lifting restriction of 35 pounds. R. 36. On November 22,

2006, a doctor restricted his lifting to no more than five pounds. R. 36-37. After that, he never returned to work. R. 37. He pursued a worker's compensation claim against his employer, which eventually was settled. The worker's compensation insurance carrier tried to help him find a job, but those efforts were unsuccessful. R. 38.

Wagner is unable to sit for longer than 45 minutes without getting up and changing positions. R. 39. He has to continue to change positions about every 45 minutes. After walking for 45 minutes, he has to sit down for about a half hour before walking again. R. 39-40. He suffers from leg cramps, and can no longer stoop. R. 44-45. He testified he cannot do a job that would require him either to stand or to sit all day. R. 52. He does not feel he can climb a ladder, and does not regularly climb stairs. R. 40-41.

Warner has carpal tunnel syndrome in both arms and hands, and he suffers from acid reflux and irritable bowel syndrome. R. 38. At the time of the ALJ hearing, he was suffering irritable bowel attacks every day. R. 39. His irritable bowel causes diarrhea and nausea. R. 38. He has trouble falling asleep, and he wakes up repeatedly. R. 43-44. He has shoulder pain if he raises his arms. R. 48.

He takes medication for acid reflux, irritable bowel syndrome, and high blood pressure. R. 41-42. Some of his medications cause him to feel dizzy. R. 43.

Wagner is able to dress himself, but has to be careful when he ties his shoes. R. 45. Because of restrictions on his ability to push and pull, he does little of the housework, although he does do some dusting, and he can do dishes for about five minutes at a time. He can take the clothes out of the washing machine and put them in the dryer. R. 46. He also can operate a self-propelled snow blower and a self-propelled lawn mower. R. 46-47. His wife does all the shopping. R. 47. He can drive his truck, but has to take breaks every hour or so. R. 48.

When asked if he could work an eight-hour day for five days a week, Wagner responded, "Probably not." R. 49. He

stated that his bowels would flare up, and as a result, he probably would miss a couple of days each week. As to his back, he stated he does not know when it is going to flare up. He stated, "I got a solid pain all the time but minimal." R. 50. He does not take medication for his back, although he does rub "Icy gel" on his lower back every day when he gets out of the shower. R. 50-51.

Wagner's wife, Janelle Wagner, also testified at the ALJ hearing. She and Wagner have been married for twenty-five years. R. 54. She confirmed much of his testimony. She testified he is unable to sit for more than 20 minutes before he has to stand up or switch positions. R. 55. He cannot stand in one place for more than three minutes at a time. His back pain makes it difficult for him to sleep, so he is up and down every night. R. 56. He is unable to do much work around the house, although he can mow the lawn and run the snow blower if he takes a lot of breaks. She testified her husband would not be able to handle a job that required him to work even 20 hours a week. R. 57. She stated he has to be close to a bathroom during the day because of his irritable bowel [syndrome].

## 2. *Wagner's medical history*

Wagner has a history of irritable bowel syndrome ("IBS") and Barrett's esophagus, an abnormalcy in the tissue lining of the esophagus. R. 250-54. On February 10, 2006, he reported to his doctor that the medication he was taking for his IBS was helping keep the problem under control "most of the time." R. 251.

After Wagner's back injury on May 26, 2006, he first sought treatment on June 6, 2006. He saw Physician's Assistant Linda Bettin at Trinity Corporate Health Services, the company's health care provider, complaining of acute back pain and strain. He told her that while working with a couple of coworkers to set a monument, he felt pain in his lower back radiating to his left buttock. R. 364. He stated he had not felt much pain from the injury until the day before his

appointment. He rated the pain at a 9 on a scale of 10. R. 365. X–rays of his back were taken, and his back appeared "essentially normal." Bettin's assessment was "acute lumbar back pain/strain." R. 365. She prescribed Flexeril and a compounded ketoprofen cream. She noted that Wagner needed nonsteroidal anti-inflammatory drugs but could not take them orally because of the Barrett's esophagus. She restricted Wagner lifting to no more than 10 pounds, with no bending or twisting, with frequent positional changes.

Wagner again saw Bettin on June 12, 2006. He reported radiating pain into his left buttock, but otherwise no marked symptoms. R. 366. He had not returned to work because of his work restrictions. He reported that ambulation was difficult. He was feeling better, but he did get some "intermittent discomfort down the right leg." *Id.* He exhibited some restriction as far as bending in flexion. She noted that the x-ray of Wagner's lumbosacral area "was essentially normal." She ordered physical therapy, and continued his work restrictions. Wagner started physical therapy on June 13, 2006. R. 279-80. On June 22, Wagner saw Bettin for a follow-up. He reported his pain had decreased, and he definitely had improved. He had stopped using the anti-inflammatory medication. When at rest, his pain was at 0 out of 10, but it did worsen throughout the day. R. 367. Bettin ordered continued therapy, with increased weight limits to between 20 and 30 pounds. She recommended that he continue using the anti-inflammatory medication and muscle relaxers.

On July 7, 2006, Wagner saw Bettin for another follow-up. He reported he was using the anti-inflammatory medication and muscle relaxers, and they were helping. R. 368. He stated the pain was like a "migraine headache in his back." Bettin ordered an MRI. The MRI indicated "a shallow disk hernia at L5-S1, predominantly extending into the left lateral spinous recess impinging on a nerve rootlet in this recess." R. 369, 257. On July 14, 2006, Bettin referred Wagner to an orthopedist. R. 370.

On July 21, 2006, Wagner was examined by Dr. David Boarini. R. 260-67. Upon examination, he found Wagner to be normal neurologically. He ordered work hardening for one to two weeks, and then a return to work. R. 449. Wagner completed physical therapy on August 11, 2006. R. 267-78. Wagner's therapist noted that he could lift 45 pounds from floor to waist ten times, 30 pounds from waist to shoulder ten times, and walk up to 20 minutes at a time. R. 268. On August 16, 2006, Dr. Boarini noted Wagner had reported to him that his lower back "feels fairly good now," and released him for work without restrictions. R. 324.

On October 27, 2007, Wagner was evaluated at the request of his worker's compensation provider by Lynn M. Nelson, M.D., an orthopaedic surgeon. R. 377. Wagner reported low back pain to the left buttock, posterior thigh and leg, with numbness, tingling, and cramping. He described the pain as severe and frequent. He reported that the pain increased his irritable bowel syndrome. He stated that ambulation was not significantly limited. He rated the pain at 3 out of 10, and he described his pain as tolerable except with very heavy lifting. R. 373. Dr. Nelson's impression was low back pain, L5-S1 degenerative disk disease, and "very small left L5-S1 disc protrusion." He advised Wagner that he was not a good surgical candidate. He recommended a functional capacity examination.

Wagner was administered a functional capacity evaluation by Physical Therapist Todd Schemper on November 15, 2006. R. 305-13. The physical assessment was "decreased trunk ROM . . . with difficulty coming out of the flexion and extension positions." R. 307. His coordination and movement characteristics were normal. R. 308. Wagner stated that he had difficulty digging and bending, and lifting and pulling were painful. R. 309. Increased activity bothered his back. He reported pain currently at 3 out of 10, but increasing to 10 out of 10 when at its worst. Schemper determined that Wagner's deficits included "forward bending in standing, kneeling, and ladder climbing," and decreased

"lifting, carrying, pushing, and pulling." R. 313. Schemper recommended an eight-hour day, 40 hours per week, at a job in the medium category for material handling, with lifting limited to 40 pounds on an occasional basis.

On November 22, 2006, Wagner saw Mary Shook, M.D. complaining of low back pain radiating down his left leg. R. 296. On physical examination, he had an antalgic gait with toe walking. He was able to forward bend with his fingertips just below the knee. He was extremely limited in his ability to extend because of pain. She recommended lifting of no more than five pounds, no bending or twisting of the back, no stooping or crouching, no pushing or pulling forcefully or repetitively more than 20 pounds, no repetitive activities with either arm, and frequent positional changes. He was given prescriptions for Flexeril and Ecotrin, "hoping that will not exacerbate any pain in his bowels."

Wagner returned to Dr. Nelson on November 28, 2006. R. 379. Dr. Nelson recommended a permanent lifting restriction of 35 pounds, but no other work restrictions. R. 379-80. He found a permanent partial impairment rating of six percent. R. 380.

Wagner saw Dr. Nelson again on April 6, 2007. R. 383-84. Wagner complained of low back pain with burning. The pain radiated to the proximal posterior thigh and left posterior leg. Wagner reported his pain had been slightly better since he had quit work. He also reported that his irritable bowel syndrome was affected by the pain. He rated the pain at 4 out of 10, increasing up to 7 out of 10 at its "most bothersome." On examination, Wagner appeared comfortable and walked well around the room. There was no particular back tenderness, and no evidence of paraspinal spasm. The remainder of the examination was normal. Wagner requested a referral to therapy, and Dr. Nelson made the referral. Wagner went to physical therapy until May 7, 2007 (R. 433-44), when the referral ended. When Wagner was discharged from therapy, he was walking better but his pain had not improved. He could stand for only 10 minutes

10

and sit for up to an hour. R. 444. He reported to his therapist that his back pain was at 3 out of 10.

In a letter dated December 8, 2007, Dr. Nelson gave Wagner a permanent lifting restriction of 35 pounds. R. 451.

The next medical record is a report of an independent medical examination performed by Elizabeth W. Stoebe, D.O., at the request of Wagner's representative. R. 446-456. The report was dated March 18, 2008. Dr. Stoebe spent one hour with Wagner, and five hours reviewing his medical records and preparing the report. Wagner reported he was taking Nexium, Nortriptyline, and Diovan/HCTZ. R. 453. He had a history of irritable bowel syndrome, Barrett's esophagus, hypertension, gastroesophageal reflux disease, and lower back pain. He had smoked two packs of cigarettes a day for 32 years. His gait was slow. He had tenderness about the lumbar sacral area and palpable muscle spasms to the left of the LS area. R. 454. Dr. Stroebe's diagnosis was LS pain with parathesias and disc protrusion with impingement of left nerve rootlet in lateral recess. R. 455. She assessed Wagner's lumbar impairment at 8%, the impairment from his condition at 1%, and a whole person impairment of 9%.

The next medical record is a report of a Functional Capacity Examination prepared by Brian S. McEvoy, DPT on March 16, 2009, the day before the ALJ hearing. R. 463-495. McEvoy determined that Wagner could perform work in the "Light-Medium" classifications. R. 463.

### 3.     *Vocational expert's testimony*

The ALJ asked the VE the following hypothetical question:

> [A]ssume that we have a hypothetical individual and this hypothetical individual does have the same vocational profile as the claimant's age, same education, same past work experience. If this individual is, at least this first hypothetical individual, is exertionally limited in what he can lift and carry. This first person can lift and carry

no more than 20 pounds occasionally, 10 pounds frequently. This individual can stand and walk up to six hours in an eight hour day. Sit six hours in an eight hour day. And his ability to push and pull would be limited to approximately 20 pounds with the upper right extremity and the upper left extremity. This individual should only occasionally climb, bend, balance, stoop, kneel, crouch, crawl. This individual should never climb ladders, ropes, or scaffolds. This individual should be able to change postural position from sitting to standing and walking approximately every 45 minutes. This individual should work in an environment free of fast paced production requirements. And this individual, besides the normal breaks and lunch periods, would need approximately two unscheduled bathroom breaks each day approximately ten to fifteen, ten to – five to ten minute a piece. Could this individual perform any of the work that he's performed in the past?

(R. 59-60) The VE answered "No." The ALJ then asked if there were any light jobs an individual with these limitations could perform. The VE responded that the individual could perform several light jobs, including office helper, order clerk, and information clerk. The ALJ then asked whether the hypothetical individual could perform these jobs if he did not have the stamina to complete a full eight hour work day, five days a week. The VE responded that he would not be able to keep any of these jobs. R. 61.

Wagner's attorney asked the VE to make the same assumptions as in the first hypothetical, but also to assume two to three absences a week. The VE responded that such a person would not be able to hold a full time job. R. 61. The attorney then asked the VE to assume the person could lift no more than five pounds. The VE responded that the person would not be able to perform even sedentary work because that

work would require that the person be able to lift up to 10 pounds on an occasional basis.  R. 62.

### 4.    *The ALJ's decision*

The ALJ found that Wagner did not engage in substantial gainful activity from May 27, 2006, the alleged onset date, through the date of her decision, May 18, 2009. R. 11.  She also found that Wagner had the following severe combination of impairments: degenerative disc disease, hypertension, irritable bowel syndrome, and status post bilateral carpal tunnel repair, although she also found that the hypertension and the status post bilateral carpal tunnel repair were, by themselves, nonsevere in nature.  *Id.*  The ALJ concluded that Wagner did not have an impairment or combination of impairments that reached the level of severity contemplated by the Listings.  R. 12.  The ALJ found as follows:

> After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) involving lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking up to 6 hours in an 8 hour day; sitting 6 hours in an 8 hour day; pushing and pulling up to 20 pounds with the bilateral upper extremities; never climbing ladders, ropes and scaffolds; only occasionally climbing, bending, balancing, stooping, kneeling, crouching, and crawling and changing postural positions from sitting to standing or walking approximately every 45 minutes.  The individual should work in an environment free from fast-paced production requirements.  The person, besides normal breaks and lunch periods, would require approximately two unscheduled bathroom breaks each day, approximately five to 10 minutes each

time.

R. 12. In making these findings, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." The ALJ stated that she had considered opinion evidence in accordance with the requirements of the applicable federal regulations. R. 12. The ALJ summarized Wagner's history as follows:

> The record reveals the claimant injured his back while performing duties as a monument setter on May 26, 2006. He continued working, but sought medical treatment through Trinity Corporate Health Services on June 6, 2006 due to persistent pain with radiation down the back of his left leg. Although he reported experiencing pain rated as 9 on a scale of 1 to 10 with 10 being the worst after prolonged sitting and upon arising, the claimant stated he did not experience numbness or tingling and had not utilized pain medication. Past medical history indicated diagnoses of irritable bowl syndrome approximately 10 years earlier and Barrett's esophagus in 2002. The claimant reported he had a DOT physical in April 2006 which revealed hypertension. He stated he had been off Diovan for a couple of weeks, but would follow through with his primary care physician. Physical examination revealed normal vital signs, slow gait, tenderness to the lumbosacral area, positive straight leg raising, and limited range of motion. X-ray of the lumbar spine was normal showing only minimal spondylosis. Linda Bettin, PA-C, diagnosed acute lumbar strain and prescribed Flexeril as well as a compounded cream. The physician's assistant provided restrictions of lifting no more than 10 pounds, frequent positional changes, no bending,

and no twisting. One week later, the claimant reported feeling somewhat better with the use of Flexeril and cream. The physician's assistant recommended modified duty and initiation of physical therapy.

On June 22, 2006, the claimant reported worsening pain after moving around and related he experienced disturbed sleep. Yet, the claimant admitted he discontinued the anti-inflammatory medication. He also reported he definitely felt he had improved. Physical examination revealed improved ambulation and decreased pain with straight leg raising. On July 7, 2006, the claimant reported pain with sitting and standing and indicated his pain worsened throughout the day. He related he experienced radiation of the pain down the left thigh to the left lateral calf. MRI on July 10, 2006 revealed shallow disc herniation at L5-S1 predominant into the left lateral spinal recess, impinging on a nerve root. When seen by the physician's assistant on July 14, 2006, physical examination revealed some improved ambulation; ability to heel and toe walk with some difficulty; and an ability to knee bend while grasping a table. The physician's assistant recommended referral to an orthopedist at that time. Physical examination on July 24, 2006, by David Boarini, M.D., a neurologist, revealed normal gait, intact strength, symmetrical reflexes, and negative straight leg raising. Dr. Boarini advised the claimant that he was not a surgical candidate and recommended a work hardening program.

Physical therapy progress notes dated July 31, 2006, indicated the claimant lifted 30 pounds in

clinic. Consequently, Dr. Boarini recommended return to work with lifting as tolerated. However, a subsequent Work Status statement dated August l7, 2006, indicated the claimant was unable to return to work until completion of the work hardening program. On August 16, 2006, Dr. Boarini noted the claimant had improved with physical therapy. Physical examination revealed normal gait, normal strength, and flexion of the lumbar spine to at least 80 degrees. The neurologist released the claimant to normal work and encouraged smoking cessation as well as exercise.

At the request of a Workers' Compensation provider, the claimant was evaluated by Lynn M. Nelson, M.D., on October 27, 2006. Physical examination revealed a height of 80 inches and weight of 173 pounds; short step gait; decreased lumbar flexion and extension, but no tenderness or paraspinal spasm; unremarkable sitting straight leg raise and hip rotation; and full lower extremity strength. The claimant indicated the heaviest he had lifted in physical therapy prior to returning to work was 35 pounds. Dr. Nelson explained the claimant was not a surgical candidate due to the predominance of axial rather than radicular pain and lack of significant neurologic impingement, but recommended functional capacity examination.

The claimant underwent functional capacity evaluation on November 13, 2006, showing maximum, consistent effort. The claimant rated his pain as 3 on a scale of 1 to 10 with 10 being the worst and further indicated he experienced level 10 pain at worst. Results indicated the

claimant fell within the medium category with ability to horizontally lift 40 pounds on an occasional basis.

The claimant was seen by Mary Shook M.D., a physician associated with Trinity Corporation Health Services on November 22, 2006, for further evaluation. The claimant rated his pain as 7 on a scale of 1 to 10 with 10 being the worst. He denied bowel or bladder changes. Physical examination revealed antalgic gait with toe walking and decreased extension. Dr. Shook restricted the claimant to modified duty including no lifting over 5 pounds, no bending or twisting of the back, no stooping, no crouching, no pushing or pulling forcefully or repetitively of more than 20 pounds, and no repetitive activities with either arm. The physician indicated a need for frequent positional changes.

When seen by Dr. Nelson on November 28, 2006, the claimant reported worsening pain with numbness, tingling, and cramping. After reviewing the functional capacity assessment with the claimant, Dr. Nelson recommended a permanent lifting restriction of 35 pounds. No return follow-up visit was scheduled.

A gap in treatment appeared to occur until April 6, 2007, when the claimant reported burning pain which radiated down the left lower extremity to Dr. Nelson. However, the claimant conversely related his pain was slightly better after he quit working on November 22, 2007. He stated bending increased his pain. Physical examination revealed no tenderness or paraspinal spasm, negative straight leg raising, and full

motor strength. Dr. Nelson observed the claimant ambulated well around the room and recommended return to physical therapy as well as continued home exercise program.

Physical therapy progress notes dated April 30, 2007 indicated the claimant was walking better and able to tolerate sitting in a good chair for a couple of hours. Upon discharge from physical therapy, the claimant related feeling more limber with improved ambulation.

At the request of the claimant's representatives, Elizabeth W. Stoebe, D.O., performed an independent medical evaluation on March 10, 2008. Physical examination revealed slow gait; normal flexion, extension, and rotation of the upper extremities bilaterally; palpable muscle spasms to the left of the lumbosacral area; ability to heel and toe walk; positive straight leg raising on the left; and normal flexion, extension, and rotation of the hips. Diagnoses included lumbosacral pain with paresthesias and disc protrusions with impingement of the left nerve root in lateral recess. Dr. Stoebe recommended referral to a pain clinic for injections.

Another gap in treatment appeared to occur until the claimant underwent functional capacity evaluation by Brian S. McEvoy, DPT, on March 16, 2009. The claimant reported increased pain with lifting, bending, stooping, pushing, and pulling. He stated he was no longer able to push a regular lawn mower. The claimant estimated he sat approximately 5 hours and stood or walked approximately 7 hours during a 24-hour time frame. Physical examination revealed decreased hip flexion and extension; slight

tenderness in the lumbosacral area; and positive supine straight leg raising. The physical therapist determined the claimant fell within a light to medium work classification.

R. 13-15 (citations to Exhibits omitted).

The ALJ found that Wagner's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of the symptoms were not fully credible. R. 15. The ALJ also found that the testimony of Wagner's wife was not entitled to significant weight "because it was not consistent with the preponderance of the opinions and observations by medical doctors in this case." R. 13.

The ALJ noted that Wagner reported an ability to care for his personal needs, and to "walk around a store with a cart, carry a bag of groceries, walk in his yard, mow with a self-propelled mower, remove snow with a snow blower, drive up to one hour, use a computer, and ride a bicycle two blocks, activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. 15. The ALJ pointed out that Wagner initially delayed seeking treatment for his back pain, and that he has not taken any narcotic based pain relieving medications despite allegations of severe pain, which suggested to the ALJ that Wagner's pain might not be as limiting as alleged. R. 15-16. The ALJ did not credit Wagner's claim that the medication had serious side effects. R. 16.

The ALJ found that the "brief, unexplained" statements of Dr. Shook and Ms. Bettin were neither persuasive nor consistent with other substantial evidence of record, and gave them little weight. R. 16. The ALJ gave greater weight to the opinion of Dr. Nelson, finding that it was supported by clinical evidence and was consistent with other substantial evidence in the record. *Id.*

The ALJ found that Wagner could perform a number of jobs existing in significant numbers in the national economy

that would be classified as "light work." R. 17. Accordingly, the ALJ held that Wagner was not under a disability within the meaning of the Social Security Act from the date of his alleged disability through the date of her decision, and he therefore was not disabled. R. 9, 17-18.

(Docket no. 17)


## II.  LEGAL STANDARDS

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. Ia. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files

an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any issue need only ask."). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of

substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise. *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were

filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; see also Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it

feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[2]

---

[2] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings. *See Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See*, e.g., *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this
(continued...)

The Commissioner has objected to Judge Zoss's Report and Recommendation advising remand for further development of the record. The Commissioner argues that the evidence is clear that Wagner did not meet the requirements of Listing § 1.04A, and that the ALJ properly developed the medical evidence regarding Wagner's alleged gastrointestinal problems (Docket no. 18). Although the court will review these findings, *de novo*, and Judge Zoss's other findings for clear error, the court reviews the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir.1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir.1998). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); see also *Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion.") (quoting *Haggard*, 175 F.3d at 594). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

---

[2](…continued)
one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

### III. LEGAL ANALYSIS

#### A. Commissioner's Objections

On February 9, 2011, the Commissioner filed Objections To The United States Magistrate Judge's Report And Recommendation (Docket no. 18). The Commissioner's specific objections are as follows.

#### 1. Listing § 1.04A, Disorders of the Spine

The Commissioner objects to Judge Zoss's finding that the record does not support the ALJ's conclusion that Wagner failed to meet the requirements of Listing § 1.04A. The Commissioner argues Judge Zoss incorrectly described the threshold criterion for Listing § 1.04A, which requires that the plaintiff show nerve root "compression" versus merely the "compromise of a nerve root or the spinal cord." (Docket no. 18, p. 2) The Commissioner argues that the medical evidence supports the conclusion that there was simply "insignificant nerve root impingement" and not nerve root "compression." *Id.* In accordance with 28 U.S.C. § 636(b)(1), the court will make a *de novo* determination on "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir.1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir.1998).

Listing § 1.04A, states as follows:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there

> is involvement of the lower back, positive straight-leg raising
> test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.  Breaking Listing § 1.04A down, the court will first examine the phrase "resulting in compromise of a nerve root."  *Id.*  According to the medical dictionary *MedlinePlus*, "compromise" is defined as "to cause the impairment of."  *MedlinePlus*, www.nlm.nih.gov/medlineplus/mplusdictionary.html. (Last visited March 29, 2011).  Thus, the phrase in Listing § 1.04A could also be read as, "resulting in the impairment of a nerve root."  According to Listing § 1.04A, this "compromise" or "impairment," includes evidence of "nerve root compression." MedlinePlus defines "compression" as "the act, process, or result of compressing especially when involving a compressing force on a bodily part."  *Id.*  Evidence of "nerve root compression" can be demonstrated by "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

The ALJ's findings that Wagner failed to meet the requirements of Listing § 1.04A are not supported by substantial evidence in the record as a whole.  Wagner has demonstrated "compression" of a nerve root as required under Listing § 1.04A through evidence of an MRI on July 10, 2006, showing "a shallow disk hernia at L5-S1, predominantly extending into the left lateral spinous recess impinging on a nerve rootlet in this recess." (R. 369, 257)  Contrary to the Commissioner's claims, the court finds that "compression" of a nerve root can be evidenced by a hernia "impinging on a nerve rootlet."  Although lacking from the medical dictionary, "impinge" is nevertheless defined by Merriam-Webster as to "encroach, or infringe."  *Merriam-Webster*, www.merriam-

webster.com/dictionary, (Last visited March 29,2011). Common sense dictates that if a hernia is "encroaching" on a nerve, the nerve is causally being compressed by the hernia. Evidence of such encroachment or compression is further exemplified by the side-effects of this impairment on the nerve, namely: Wagner's complaints of pain radiating down the left side of his left leg (Tr. 296, 303, 322, 387); limited range of motion (Tr. 33, 296, 300, 301, 302, 307, 313, 387); leg cramping (Tr. 276); reflex loss (Tr. 387); limitations on lifting over a set amount of weight (Tr. 33, 302, 300, 296); and positive straight leg test (Tr. 299, 300, 301, 302). These examples, provided by Wagner, directly correlate to the requirements in Listing § 1.04A characterizing evidence of nerve root compression. However, it is unclear from the record that the ALJ considered these examples at all in the determination of her ruling. Thus, the court concurs with Judge Zoss in finding that the record does not support by substantial evidence the ALJ's conclusion that Wagner failed to meet the requirements of Listing § 1.04A. The case should be remanded to the Social Security Administration to further develop the record and to fully address this issue in its ruling. *Senne v. Apfel*, 198 F.3d 1065, 1068 (8th Cir. 1999).

### 2. *Gastrointestinal Problems*

The Commissioner also objects to Judge Zoss's finding "that the record was 'devoid of evidence' regarding [Wagner's] alleged gastrointestinal problems, and therefore further evidence should be developed on remand." (Docket no. 18, p. 4) The Commissioner notes that "the ALJ partially credited [Wagner's] allegations regarding his irritable bowel syndrome." *Id.* For instance, in Wagner's RFC determination, the ALJ added two unscheduled bathroom breaks to accommodate such complications. *Id.* The Commissioner argues that "the medical evidence does not support the existence of functional limitations more severe than those assessed by the ALJ" concerning Wagner's alleged gastrointestinal problems, and as a result, the substantial evidence as a whole supports the ALJ's decision.

*Id.* at 4-5. The court will take an "independent review" of this matter to ascertain whether the ALJ had substantial evidence on the record as a whole when dismissing Wagner's claims of disability related to his alleged gastrointestinal complications. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991).

On several occasions, Wagner alleged that his irritable bowel syndrome is aggravated by his back pain, causing nausea and diarrhea almost daily. (Tr. 38-39, 384, 296, 49, 56-57, 387) Wagner also alleged that the combined effect of his back pain and irritable bowel syndrome would require him to have to leave work early or miss work. (Tr. 49) Without warning, Wagner's irritable bowel syndrome would cause him to rush to the bathroom, requiring him to be near a bathroom during the day. (Tr. 57) Wagner claimed that normal activities, such as bending over to tie a shoe, would cause his back to flare up and instigate his irritable bowel syndrome. (Tr. 50) Furthermore, Wagner was not able to use stronger oral medications for his back pain because of his Barrett's esophagitis and irritable bowel syndrome. (Tr. 301) Significantly, the Vocational Expert ("VE") when presented with a question of whether an individual with Wagner's characteristics involving back pain and irritable bowel syndrome, requiring unscheduled bathroom breaks and two to three absentees a week, would be able to qualify for gainful employment, testified: "No." (Tr. 61)

The court notes that none of these allegations are addressed by the ALJ in reaching her decision. The court agrees with Judge Zoss that the record is "devoid of evidence" on the question of whether Wagner was disabled due to complications resulting from his irritable bowel syndrome and back pain. As a result, the record on the whole does not support by substantial evidence the ALJ's conclusion that Wagner's subjective pain complaints, caused by his gastrointestinal problems and back complications, were not credible. On remand the ALJ should fully develop the medical record and address this

issue.

## B. Report and Recommendation

Apart from the foregoing objections, the court reviews the magistrate judge's Report and Recommendation (Docket no. 17) under a "clearly erroneous" standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996). After conducting its review, the court is not "'left with [a] firm and definite conviction that a mistake has been committed,'" and finds no reason to reject or modify Judge Zoss's recommendation. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

In Judge Zoss's Report and Recommendation, he found that the record supports the ALJ's conclusions that Wagner's daily activities were inconsistent with his claimed back disability, in that his daily activities go beyond light housework and minimal routine daily activities.[3] Judge Zoss also found that the record supported the ALJ's conclusion that the disabling nature of Wagner's pain was inconsistent with the findings of many of the doctors who treated Wagner. Finally, Judge Zoss held that the record supports the ALJ's conclusion that Wagner's back injury and resulting back pain did not prevent him from work. No party has objected to these conclusions by Judge Zoss. Thus, for the reasons

---

[3] I personally am skeptical of the ALJ's conclusion that Wagner's daily activities were inconsistent with his claimed back disability. It is noted that while Wagner can mow the lawn, he uses a self-propelled mower, takes frequent breaks, and sometimes it takes him all day. (Tr. 46, 56) It is also noted that Wagner only carries small packages of groceries, one at a time, and that his wife does all the grocery shopping. (Tr. 48, 452). Finally, it is recognized that Wagner cannot vacuum or move furniture around his house, and can only wash a few dishes at a time because of the pain caused by bending over the sink. (Tr. 452) In spite of these allegations, I am unwilling to find Judge Zoss's decision clearly erroneous, and find no reason to modify his recommendation. However, these issues should be addressed by the ALJ on remand.

stated by Judge Zoss, the court accepts his Report and Recommendation and remands this case pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration and to address the court's previous concerns.

## IV.  CONCLUSION

For the foregoing reasons, the court finds that the ALJ's findings are not supported by substantial evidence in the record as a whole and accepts Judge Zoss's Report and Recommendation (Docket no. 17).  The proper remedy is remand to allow the Commissioner to correct the deficiencies in the ALJ's decision.  Therefore, the Commissioner's decision is reversed and this case is **remanded** for further development of the record regarding whether Wagner met the requirements of Listing § 1.04A and to obtain sufficient evidence concerning his alleged gastrointestinal complications.

**IT IS SO ORDERED.**

**DATED** this 30th day of March, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA